IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


UNITED STATES OF AMERICA

VS.                                        CRIMINAL NO. 1:17CR90

MARIA TERESA DUARTE GODINEZ,
ALFONSO FONTY JAIMES


**TRANSCRIPT OF SENTENCING HEARING**


BEFORE THE HONORABLE LOUIS GUIROLA
UNITED STATES DISTRICT JUDGE

DECEMBER 20, 2018
GULFPORT, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:
  SHUNDRAL COLE, ESQUIRE
  OFFICE OF THE UNITED STATES ATTORNEY
  1575 20TH AVENUE
  GULFPORT, MISSISSIPPI  39501

FOR THE DEFENDANT, MARIA TERESA DUARTE GODINEZ:
  ROBERT K. PISARICH, ESQUIRE
  KEITH PISARICH, ATTORNEY
  POST OFFICE BOX 936
  BILOXI, MISSISSIPPI  39533-0936

FOR THE DEFENDANT, ALFONSO FONTY JAIMES:
  ELLEN MAIER ALLRED, ESQUIRE
  OFFICE OF THE FEDERAL PUBLIC DEFENDER
  2510 14TH STREET, SUITE 902
  GULFPORT, MISSISSIPPI  39501

INTERPRETER:  BALBINA CALDWELL


REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              2012 15TH STREET, SUITE 403
              GULFPORT, MISSISSIPPI  39501
              (228)563-1748

1    **THE COURT:**  Madam clerk, you may call the case.

2    **THE CLERK:**  The United States District Court for the

3 Southern District of Mississippi, Southern Division, Criminal

4 Case Number 1:17cr90, United States of America versus Alfonso

5 Fonty Jaimes and Maria Teresa Duarte Godinez, set for

6 sentencing.

7    **THE COURT:**  What says the government?

8    **MS. COLE:**  Good morning, Your Honor.  Shundral Cole

9 for the government, and we are ready.

10    **THE COURT:**  What says the defendant, Jaimes?

11    **MS. ALLRED:**  We are ready to proceed, Your Honor.

12    **THE COURT:**  What says the defendant, Godinez?

13    **MR. PISARICH:**  Yes, Your Honor.  Keith Pisarich

14 present for the defendant, Maria Teresa Duarte Godinez.  Also

15 present in the courtroom, of course, is my client, along with

16 the court's interpreter, Ms. Caldwell.  We are ready to

17 proceed.

18    **THE COURT:**  Very well.  Let the record reflect that

19 the Court has decided to conduct the sentencing hearing in this

20 matter as to both defendants at the same time.  The issues are

21 the same, the objections raised in the presentence

22 investigation report are identical, and they are both charged

23 in the same indictment.  Does the government have any objection

24 to taking up both of these sentencing hearings at the same

25 time?

1    **MS. COLE:**  No, Your Honor.

2    **THE COURT:**  Does the defendant Jaimes have any

3    objection?

4    **MS. ALLRED:**  We don't, Your Honor.

5    **THE COURT:**  Does the defendant Godinez have any

6    objection?

7    **MR. PISARICH:**  No, Your Honor, we don't, but I do

8    have an announcement to the Court.  As stated in our objections

9    to the presentence investigation report, we have made an

10   objection as far as mitigating role, a minor participant.  If

11   the Court would allow us, we would like to withdraw that

12   objection, as well as we would like to make sure the Court is

13   specifically aware that we did make an objection with regard to

14   possession of the gun, and the gun that we're referring to in

15   that particular matter, I wasn't as specific as I should have

16   been, was the nine-millimeter gun that was found on Ms.

17   Snodgrass' possession when she was arrested.  That's the gun

18   that we were referring to.  I had put gun.

19   **THE COURT:**  Yeah, I think that's -- that's my

20   understanding as well, which is the same objection made by Mr.

21   Jaimes.

22   **MS. ALLRED:**  It is, Your Honor.  And after filing the

23   objection, Ms. Snodgrass made it to the district.  And when I

24   interviewed her, she gave me facts that I think are those that

25   we're not able to overcome.  If she were called to the stand,

1  which I think she will be, and we can get into it then, I think

2  she is going to testify essentially that she told the

3  defendants that she had a gun with her.  So we would stipulate

4  to those facts, that maybe there was knowledge that they had

5  the gun.  And it just becomes a legal question at that as to

6  whether I guess the other facts that Ms. Snodgrass will testify

7  to, such as the fact that she had had the gun long before she

8  went on these trips, I think -- what I'm saying to the Court

9  is, that is the extent of my objection, whether under the facts

10  that I think are going to be elucidated when she testifies,

11  whether it is appropriate to hold all of them responsible for

12  the gun.

13       **THE COURT:**  Fair enough.  We will take those matters

14  up one at a time.

15       **MR. PISARICH:**  I think, Your Honor, I likewise

16  interviewed Ms. Snodgrass, and I think that's pretty well the

17  same understanding I had after interviewing her, as far as what

18  she would say referencing the gun, the nine-millimeter.

19       **THE COURT:**  What you are telling me is that it may

20  not be a factual dispute but instead a question of application

21  of that particular guideline to those facts?

22       **MS. ALLRED:**  Yes, Your Honor.

23       **MR. PISARICH:**  Yes, Your Honor.

24       **THE COURT:**  Let me take up a couple of housekeeping

25  matters first.  Insofar as Ms. Godinez is concerned, it is my

1  understanding, Mr. Pisarich, that she is in the need of a court

2  interpreter.  And to that end, we have Ms. Balbina Caldwell

3  here.  Is that accurate?

4          **MR. PISARICH:**  I missed the first part.

5          **THE COURT:**  Your client needs the services of an

6  interpreter, is my understanding.

7          **MR. PISARICH:**  She feels much better, Your Honor,

8  with the services of an interpreter.  She does speak some

9  English.  I have been able to communicate back and forth with

10 her to a certain degree, but as far as the sentencing, I think

11 it would be out of an abundance of caution for the Court to use

12 the services of an interpreter.

13         **THE COURT:**  Well, to that end, of course, we have

14 asked Ms. Caldwell to join us.  Unfortunately, Ms. Caldwell is

15 not a certified court interpreter.  However, in my judgment,

16 she is an exceptionally gifted interpreter and has demonstrated

17 that ability many times.  Does Ms. Godinez have any objections

18 to the use of Ms. Caldwell as the interpreter here?

19         **MR. PISARICH:**  She has just been asked that question

20 by the interpreter, and she has responded no.  We have used Ms.

21 Caldwell in the past, I think at the plea, and everything went

22 well then.

23         **THE COURT:**  Very well.  Without objection then, the

24 Court does find that a certified court interpreter is not

25 reasonably available at this time.  However, Ms. Caldwell has

1   demonstrated her –– I think I referred to it as a gift, but her

2   skill as serving as an interpreter and will do so here today.

3   Would the clerk of the court please swear in the court

4   interpreter.

5          (OATH ADMINISTERED TO INTERPRETER).

6          **THE COURT:**  All right.  Well, let the record reflect,

7   before we get too very much along, that I did conduct a very

8   brief in-chambers conference with counsel for the government,

9   counsel for both defendants, and the probation office was

10  present as well.  At that particular time, I was advised by Ms.

11  Allred that she intended to call one of the confidential

12  informants, Ms. Snodgrass, to the stand to produce some

13  testimony which may be in conflict with some of the materials

14  that she provided or some of the information that she provided

15  to the case agent and which ultimately found its way into the

16  presentence investigation report.  So I ask you, Ms. Cole, is

17  the agent who interviewed Ms. Snodgrass available today?

18         **MS. COLE:**  Yes, Your Honor, he is present in the

19  courtroom.

20         **THE COURT:**  All right.  Very good.  Let's take this

21  matter up then.  First of all, we will deal with the

22  guidelines.  Ms. Cole, on behalf of the government, did you

23  receive the presentence investigation report?

24         **MS. COLE:**  Yes, Your Honor.

25         **THE COURT:**  And did you have an opportunity to go

1  over it?

2  **MS. COLE:**  I did, Your Honor.

3  **THE COURT:**  Does the government have any objections

4  either to the findings of fact or the application of the

5  guidelines in either of the reports dealing with Mr. Jaimes or

6  with Ms. Godinez?

7  **MS. COLE:**  No, sir, Your Honor.

8  **THE COURT:**  Very well.  Ms. Allred, on behalf of Mr.

9  Jaimes, did you have an opportunity to observe and to read and

10  to go over the presentence investigation report with him?

11  **MS. ALLRED:**  I did, Your Honor.

12  **THE COURT:**  In your judgment, did he understand the

13  findings of fact and the application of the guidelines

14  contained in the report?

15  **MS. ALLRED:**  He did, Your Honor.  He's been very

16  helpful in helping me develop evidence maybe that is not

17  consistent with the presentence report.

18  **THE COURT:**  All right.  I'm aware that you've made

19  two objections --

20  **MS. ALLRED:**  That's correct.

21  **THE COURT:**  -- to the presentence investigation

22  report.  Those are in writing.  But would you encapsulate those

23  two objections for the record so that we can frame the issues?

24  **MS. ALLRED:**  Yes, sir.  Keep in mind, Your Honor,

25  that when I filed these objections, it was before I had had an

1    opportunity to interview Ms. Snodgrass personally.

2            **THE COURT:**  Sure.

3            **MS. ALLRED:**  But the gist of the first objection is

4    that Mr. Jaimes qualifies for a minor role, that he played a

5    significantly -- I guess a significantly less role than the

6    other players in this drug trafficking conspiracy.

7            And then the other objection has to do with the firearm.

8    And again, it was prior to the time that I had an opportunity

9    to interview Ms. Snodgrass.

10           And therefore, I think that we are clear on what the facts

11   are going to show.  I think the facts are going to show that

12   Ms. Snodgrass will testify that she always carried a gun with

13   her, that she purchased the gun several years before she began

14   carrying it, that she advised both Mr. Jaimes and Ms. Godinez,

15   I guess in passing, that she carried a gun.  So the question

16   becomes really was that gun there to facilitate this drug

17   transaction and was -- or is it also attributable to Mr.

18   Jaimes.  So those are the two objections.

19           And before I cede the floor, it is my understanding that

20   although the government says they don't object to the facts in

21   the presentence report, that they neither -- that they agree

22   that a minor role as participant for Mr. Jaimes is appropriate

23   in this case.  And of course, recognizing the fact that the

24   Court isn't bound by that, and to the extent -- I think it is a

25   good idea to put Ms. Snodgrass on the stand because if the

1    Court were to simply go with what the parties think is

2    appropriate without putting on any testimony, we would be left

3    with a presentence report that has facts that are inconsistent

4    with both the parties' agreement, as well as a ruling.

5            **THE COURT:**  All right.  I think your points are well

6    taken, Ms. Allred.  The fact that you have called Ms. Snodgrass

7    and we are going to hear from her under oath is very helpful to

8    the Court, because there are inconsistencies in what she has

9    said, and it is important to try to nail down how that happens

10   and how the probation officers are literally left holding the

11   bag with information contained in DEA-6s and FBI 302s that are

12   later inconsistent with what the informants say.

13           You know, having had some experience in not only being a

14   judge, but as a prosecutor and as a law enforcement officer, I

15   understand how that can occur, but we need to pin it down, and

16   we need to find out how and under what circumstances that

17   occurred.

18           **MS. ALLRED:**  Your Honor, if I may, I guess sort of as

19   an opening statement, I think that when a person is interviewed

20   can play a part in how a report is crafted.  When Ms. Snodgrass

21   was interviewed, this case was very small and very focused, and

22   this is what was known.  And as the facts began to develop and

23   the sphere begins to spread, I think it is less the fact that

24   reports are wrong.  It's just that they don't necessarily

25   describe the big picture.

1      **THE COURT:**  Well, we will hear what Ms. Snodgrass has

2  to say, and both sides will have a full opportunity to require

3  her to, shall we say, experience the crucible of both direct

4  and cross-examination.

5      **MS. ALLRED:**  Yes, sir.

6      **THE COURT:**  All right.  Mr. Pisarich, on behalf of

7  your client, Ms. Godinez, did you also have an opportunity to

8  go over the presentence investigation report with her?

9      **MR. PISARICH:**  I did, Your Honor.

10      **THE COURT:**  Did you find it necessary to use an

11  interpreter for that?

12      **MR. PISARICH:**  I did, Your Honor, use an interpreter,

13  at least on I think one or two occasions, and talked back with

14  her on maybe one or two more.

15      **THE COURT:**  In your judgment, did she understand the

16  presentence investigation report and the application of the

17  guidelines as contained in the report?

18      **MR. PISARICH:**  She did, Your Honor.  She did.

19      **THE COURT:**  All right.  And I understand that even

20  though you made two objections that were in writing, and you

21  intend to withdraw one, why don't you go ahead and state into

22  the record what those objections are and those that are

23  withdrawn so that we can frame the issues.

24      **MR. PISARICH:**  Right.  Your Honor, I think one thing

25  we don't need to get into right now, even though I made a

1    reference to it in my -- from paragraph 22 of the report, in my

2    paragraph 22, is my client's either knowledge or lack of

3    knowledge of this heroin or black heroin that was found with

4    Ms. Snodgrass.  That's not going to affect the computation, so

5    we will withdraw that, if the Court please.  The computations,

6    even without it, go to the max.

7              **THE COURT:**  Have you discussed that with your client?

8              **MR. PISARICH:**  Yes, Your Honor.

9              **THE COURT:**  Is she in agreement with that?

10             **MR. PISARICH:**  Yes, Your Honor.

11             **THE COURT:**  Is that correct, Ms. Godinez, that you

12    are in agreement to withdraw that objection?

13             **DEFENDANT GODINEZ:**  Yes.

14             **MR. PISARICH:**  The issue is, Your Honor, we are

15    withdrawing the objection.  We are not basically admitting that

16    she had because there is no sense in prolonging the hearing if

17    the outcome either way is the same result insofar as the base

18    offense level.  That's my point.

19             **THE COURT:**  All right.

20             **MR. PISARICH:**  Again, Your Honor, on paragraph 77, as

21    far as the offense level computation, we object to the

22    nine-millimeter gun that was found in Ms. Snodgrass' possession

23    being attributable to my client, if the Court please.  Again,

24    in paragraph 78, that's the one where we made an objection

25    insofar as role in the offense.  We have, as previously stated

1    to the Court this morning, withdrawn that objection, if the

2    Court please.

3        And that's --

4    **THE COURT:** I presume that you have discussed that

5    also with your client and withdrawn that objection as to the

6    role adjustment?

7    **MR. PISARICH:** I did. As soon as we came out of that

8    conference with the interpreter, I discussed that with my

9    client, and she agrees to do what I'm announcing to the Court,

10    withdraw that objection with the Court.

11    **THE COURT:** Is that correct, Ms. Godinez?

12    **DEFENDANT GODINEZ:** Yes.

13    **THE COURT:** Very well. That objection is withdrawn.

14    All right. I think it best, for the purposes of the two

15    objections that remain on behalf of Mr. Jaimes and the one

16    objection that remains on behalf of Ms. Godinez, is that we go

17    ahead and take up the testimony of Ms. Snodgrass and get that

18    behind us. Would that process be acceptable to the government?

19    **MS. COLE:** Yes, Your Honor.

20    **THE COURT:** Ms. Allred, would that be acceptable to

21    your client?

22    **MS. ALLRED:** It would, Your Honor. And I would

23    request, since I brought Ms. Snodgrass to the district to call

24    as a witness on Mr. Jaimes' behalf, that I do direct.

25    **THE COURT:** All right. And Mr. Pisarich, is that

1  process all right with you?

2  **MR. PISARICH:**  That's fine with me, Your Honor, as

3  long as I have the potential to ask some questions, if

4  necessary.

5  **THE COURT:**  But of course.  Is Ms. Snodgrass

6  represented by counsel?

7  **MS. ALLRED:**  She was represented in the underlying

8  case by Doyle Coats, and prior to my reaching out to Ms.

9  Snodgrass -- initially, I reached out by phone to see if I

10  could speak to her without actually bringing her to the

11  district, but she -- she, I think, wisely declined to speak to

12  me without first speaking to the government.  Mr. Coats said he

13  no longer represented her, so when I brought her here, I

14  interviewed her myself.  I think she has also been in contact

15  with, not directly, the government, but has also met with the

16  agent who conducted the initial interview at least once -- one

17  time?

18  **AGENT:**  I met with her twice.

19  **MS. ALLRED:**  Twice since she has been here.

20  **THE COURT:**  All right.  More directly, is she

21  represented today by counsel?

22  **MS. ALLRED:**  No, she's not, and nor do I anticipate

23  that she is going to be asked any questions that would tend to

24  incriminate her.

25  **THE COURT:**  That's my concern here, that --

1    **MS. ALLRED:** I guess neither party, I think, and

2    correct me if I am wrong, but neither the agents, the FBI, or I

3    think that once she testifies that she will have made any false

4    statements. I think we are all in agreement on what she has

5    told them and what she has told me.

6    **THE COURT:** Let me ask you this hypothetical

7    question. I don't know what Ms. Snodgrass is going to say

8    under oath.

9    **MS. ALLRED:** Sure.

10   **THE COURT:** I only have the representation that

11   you've made, Ms. Allred as an officer of the Court, that there

12   will be inconsistencies in what she has said to you and what

13   she has said to an investigator, I presume a DEA -- Ms. Cole, a

14   DEA agent?

15   **MS. COLE:** FBI, Your Honor.

16   **THE COURT:** An FBI agent. That could very well

17   expose her to a new or a different prosecution for making a

18   false statement to that FBI agent. Under those circumstances,

19   are we treading in dangerous waters here by requiring Ms.

20   Snodgrass under oath to tell us that she told the FBI agents

21   something that wasn't true?

22   **MS. ALLRED:** I don't think she did.

23   **THE COURT:** Speaking hypothetically.

24   **MS. ALLRED:** Hypothetically, I don't think she did.

25   I think that -- I'll give an example. Like the initial reports

would say things like she worked for Teré and her husband.  And Teré's husband was there.  Okay.  But what exactly it was that he was doing -- the devil is going to be in the details.  I can't speak for FBI and the government, but I don't think that anybody thinks that she has at any time lied to the FBI or that her statements that she is going to make today are inconsistent with anything she has ever said from the get-go.

**THE COURT:**  I'm just looking at the presentence investigation report, starting with paragraph 28.  "When questioned further about the involvement of Godinez and her husband, she claimed that Godinez handled the business part.  Snodgrass knew that she personally knew Godinez would wire funds to Mexico.  Snodgrass further stated that she turned her receipts for travel in to Godinez, who reimbursed her."

The next paragraph deals with Mr. Jaimes.  "Snodgrass stated that Alfonso Jaimes was more operationally involved in the drug transaction organization, the DTO, and often paid her for her services as a courier in cash or drugs for payment.  She stated that she bought an ounce of methamphetamine at a time from Jaimes because she could purchase it for $400, and would make this purchase once a month.  When she was paid in cash, Snodgrass would often use the money to fund prepaid MasterCard and American Express and did not deposit the money."

In paragraph 30, "Snodgrass advised that Godinez and Jaimes lived in south Austin, Texas, and she had gone to their

apartment on prior occasions to get paid and turn in receipts. Agents confirm that the registered address of Godinez and Jaimes was an apartment at the complex."

Finally, in paragraph 31, "Snodgrass claimed that Godinez and/or Jaimes arranged all of the drug shipments. When either of them needed a load of narcotics shipped, they would contact" -- the problem is -- quoting from the report, it says, "They."

**MS. ALLRED:** I know.

**THE COURT:** "They would contact her and arrange a time for Godinez's cousin to drop off a load. Snodgrass claimed that Godinez's cousin typically brought the drug shipments to her."

**MS. ALLRED:** And I guess, Your Honor, what I -- it does -- it appears from the reports, in hindsight, that Mr. Jaimes is lumped in with a lot of conduct that involves his wife. He is not innocent. He did participate. But when you go back in hindsight and look at what he did and the whole -- I guess the whole scope of it, I think it becomes clear that he is a lesser player.

And I see where you are going. I mean, out of an abundance of caution, it could not hurt. I hate to -- I hate to keep Ms. Snodgrass here any longer than is necessary. I mean, one thought that I have is to do a proffer of what her testimony would be and perhaps discuss it with the government

1 and the probation office to see if the facts can be tweaked in

2 the presentence report without actually calling her. I'm just

3 trying to come up with a solution.

4     I mean, I have the report of the statements that she gave

5 to me, that she was allowed to review and change. I also gave

6 it to the agent in this case, who was able to review it. So I

7 really feel like, to a certain extent, we are on the same page,

8 just that we haven't necessarily brought anyone else into that

9 page with us. So --

10     **THE COURT:** Ms. Cole, what is the government's

11 position on this? It's -- well, I will point out what should

12 be obvious. The government -- it's the government's job not

13 just to obtain convictions but to be sure that justice is being

14 done, and I want to be sure that everyone in this courtroom,

15 including the witness, Ms. Snodgrass, is afforded every

16 opportunity that due process and justice requires.

17     Now, there are some inconsistencies here that may simply

18 be semantic inconsistencies. I'm fine with that. It can

19 happen. But what's the government's position?

20     **MS. COLE:** Your Honor, the government's position is,

21 I believe what -- more specifically, what Ms. Allred is

22 speaking to is that clarification is needed as far as what the

23 roles of each of these defendants in this case -- what their

24 roles were, according to Ms. Snodgrass. I don't want to say on

25 the record that the government would not pursue potential

charges against Ms. Snodgrass if something she says on the stand is inconsistent. I don't believe that -- or that she will get on the stand and perjure herself or lie, as far as what she told to the FBI agent when she was interviewed after she was arrested.

I think the interview that Ms. Allred has conducted with her, along with the case agent, who has seen her twice since she has been back in the district, I think her statements are consistent with what she has already -- the information she has already provided. I just think that there is some clarification that is needed from Ms. Snodgrass as to the roles of each of these defendants.

**THE COURT:** All right.

**MS. ALLRED:** And again, Your Honor, one possible selection, but I don't know that it's the best solution, and that would be for the government and I and the probation office to sit down with the report of the statements that were made by Ms. Snodgrass and notate where they differ from what is included in the presentence report, so that as it related to Mr. Snodgrass -- I'm sorry, as it related to Mr. Jaimes was correct based on what the parties can agree that Ms. Snodgrass would say. To the extent that we all can't agree, she is here. And it may narrow down -- narrow down those issues.

I mean, to be clear, she is here, and she's a good witness, and she knows what happened, and we can put her on the

1   stand and it will go forward, or those facts will also work if

2   probation needed to ask her questions to clarify things that we

3   couldn't all agree on.  But I think that there are true

4   consistencies -- inconsistencies between the verbiage, the way

5   that Mr. Jaimes tends to be lumped into some conduct that he

6   didn't participate in, that were carried through all the way

7   into the presentence report, that if you read that presentence

8   report and take it faithfully do not support a minor role, but

9   I think that the facts in the case do.  And we have nothing to

10  hide about that.

11         **THE COURT:**  Let me do this.  I don't think Ms. Cole

12  objects to the prosecution meeting with counsel for the

13  defendant --

14         **MS. COLE:**  No, Your Honor.

15         **THE COURT:**  -- and seeing if there are some

16  stipulations as to the facts or proffers of the testimony.  I

17  can't be a part of either team.  I'm concerned about Ms.

18  Snodgrass' constitutional rights at this point.

19         **MS. ALLRED:**  Sure.

20         **THE COURT:**  And I have to leave it to the government

21  and have some confidence in the government that if there's an

22  intentional misrepresentation of facts whether or not they

23  intend to proceed with criminal charges.  That's not up to me.

24  That's up to the executive branch.  But I don't want to be a

25  part of putting Ms. Snodgrass in a position where she does

1  exactly that, makes the government's case on either a thousand

2  and one for lying to an FBI agent or perjured testimony from

3  the stand.  So if the parties can -- I guess what I'm getting

4  down to, Ms. Cole, I have to rely on the integrity of the

5  executive branch to review what facts are available to

6  determine are there simply semantical differences in what has

7  been provided and what is available in the report, or are there

8  intentional falsehoods on the part of Ms. Snodgrass that need

9  to be followed through.  And that matter, that investigation,

10 that conclusion should be left to the prosecution and not to

11 me.

12      What I will say, and I will put this in as a footnote is

13 that when the Court gets ready to proceed in a sentencing

14 hearing, it relies on the report made by the probation office

15 and the presentence investigation report, and the probation

16 officers rely on what is in the reports of investigation.  And

17 when there are material differences, that puts everybody in a

18 very difficult spot, particularly the probation officers.

19      Let's take a recess, then, and Ms. Allred, I invite you

20 and Mr. Pisarich and counsel for the government, as well as the

21 investigating officer, to -- and I think Ms. Allred, you've

22 even included the probation officers.

23           **MS. ALLRED:**  If you think that that is acceptable.

24           **THE COURT:**  I don't think there is anything that

25 would prevent it.  And see what it is you can work out in the

1  form of stipulated facts or --

2  **MS. ALLRED:**  Your Honor, I still have one worry

3  that -- how do we clean up the PSI?  Is it sufficient to come

4  up with stipulations, or do we need to go through line by line

5  and clarify where there are things that we think need to

6  change?  Because there needs to be -- it's often a problem for

7  defense counsel when there are findings by the Court that

8  aren't necessarily consistent with the PSI, and we go back

9  after the fact and really all we have is this PSI.  I guess I'm

10  asking are stipulations sufficient, or do we need to --

11  **THE COURT:**  Stipulations of fact, where there are

12  differences in the PSI, is what the Court will consider,

13  obviously.

14  **MS. ALLRED:**  Okay.

15  **THE COURT:**  And when those facts are stipulated, I

16  will take those facts and digest them and analyze them and

17  apply them to the guideline and determine is Mr. Jaimes a

18  minor -- entitled to a minor role adjustment or not, by a

19  preponderance of the evidence.

20  And parenthetically, we need to discuss the issue related

21  to the firearm as well because that's an application of the

22  guidelines as opposed to -- it doesn't seem to be a dispute

23  about the fact that Ms. Snodgrass had a pistol at the time that

24  she was arrested and that -- I think what you are telling me is

25  that both defendants knew that she had a pistol.

1          **MS. ALLRED:**  Well, if Snodgrass was going to testify,

2     that is what she would testify to.

3          **THE COURT:**  I will take a recess, and y'all let me

4     know when you are ready.

5          **(RECESS TAKEN AT 10:46 A.M. UNTIL 1:10 P.M.)**

6          **THE COURT:**  Is the government ready to proceed?

7          **MS. COLE:**  Yes, Your Honor.

8          **THE COURT:**  Are the defendants ready to proceed?

9          **MS. ALLRED:**  Defendant Jaimes is ready to proceed.

10         **MR. PISARICH:**  Defendant Godinez is ready to proceed,

11    Your Honor.

12         **THE COURT:**  All right.  Then I turn, Ms. Allred, to

13    you because the only objection here which requires some

14    additional facts is the objection that your client has made in

15    regard to the -- his minimal participation.  Do you intend to

16    call any witnesses?

17         **MS. ALLRED:**  Your Honor, in an effort to avoid having

18    to call Ms. Snodgrass to the stand, I sat down and met with the

19    probation officer, the prosecutor and co-counsel in an attempt

20    to reach a series of stipulations.  We maintain the position

21    that compared to others involved in this offense that Mr.

22    Jaimes was a minor participant, and that the original reports,

23    while they made their best effort to get things accurate, don't

24    give the flavor for his participation, that what he did, he did

25    at the behest of his wife and that his role was relatively

minor.

So we have attempted to clarify where we think that the presentence report is not accurate in that it tends to lump Mr. Jaimes in with all of his wife's conduct.

We've attempted to do this to avoid calling Ms. Snodgrass to the stand. I am still perfectly willing, if the Court feels that it needs additional information, to put her on the stand and fill in any of the blanks that there are concerning this conduct. I feel like I don't necessarily need to, that the facts are sufficient to establish a minor role, and it is my understanding that the government agrees that this defendant should get a minor role. And we've tried to resolve this in a way that did not involve jeopardizing Ms. Snodgrass. It's a bit of a difficult position to no end because I don't know whether I need to call any further witnesses.

**THE COURT:** It's up to you.

**MS. ALLRED:** On advice of co-counsel, he suggested that we enter these stipulations into evidence in lieu of the testimony. Certainly Ms. Snodgrass is available, and should the Court feel that there are gaps in the evidence that you need to have in order to make an informed decision, we are available to call her. However, we will rest on these stipulations.

**THE COURT:** Any objection -- are these your stipulations as well, Ms. Cole, on behalf of the government?

1      **MS. COLE:**  Yes, Your Honor.  As Ms. Allred stated, we

2  all met with Ms. Snodgrass and went over, asked her specific

3  questions.  Ms. Allred transcribed the information that Ms.

4  Snodgrass provided, and we asked her to clarify anything that

5  we needed, and we made sure that what was placed into these

6  stipulations were accurate, and we all agreed they were

7  accurate.  So the government does agree with the stipulations.

8      **THE COURT:**  All right.  It will be marked and

9  admitted as Defense Exhibit Number 1 to this sentencing

10  hearing.  Please provide it to the clerk.

11      **(EXHIBIT D-1 MARKED)**

12      **THE COURT:**  All right.  Anything else on behalf of

13  the defendant, Mr. Jaimes?

14      **MS. ALLRED:**  Not in terms of evidence, unless the

15  Court would like more information about the total organization.

16  Again, I'm attempting to abbreviate and minimize exposure for

17  Ms. Snodgrass.  We could probably talk about things that went

18  on all day long, but what we are attempting to demonstrate is

19  that when you consider the participants in this, Mr. Jaimes was

20  on the low end of the totem pole.

21      **THE COURT:**  This stipulation that the government and

22  the defendant have entered into would tell me what Mr. Jaimes'

23  participation is insofar as Ms. Snodgrass is concerned, but it

24  gives me no information whatsoever as to what Mr. Jaimes'

25  participation was in the overall conspiracy and what makes him

1  substantially less culpable than any other member.  This just

2  tells me what he did with her.  I have no idea what he did with

3  others, and there's no evidence in that regard.  Do you intend

4  to offer any evidence in that regard?

5       **MS. ALLRED:**  I guess, Your Honor, the evidence in

6  this case came from Ms. Snodgrass to a large extent.  His role

7  in the offense was set by the statements that Ms. Snodgrass

8  provided in her proffer.  So I'm attempting, in establishing

9  what his role in the offense is, to -- I guess to --

10      **THE COURT:**  Let me help you with that.  You're trying

11  to encapsulate what Mr. Jaimes' role is based on what he did

12  with Ms. Snodgrass.  This is a conspiracy case, which involves

13  a lot of other players, and the burden is upon the defendant to

14  demonstrate to me by a preponderance of the evidence, and there

15  must be some evidence that tends to indicate that his

16  participation in that overall conspiracy is less culpable,

17  substantially less culpable than the ordinary participant.

18  Now, Ms. Snodgrass was able to tell me what he did insofar as

19  she is concerned, but there is no evidence before the Court at

20  this time as to what he did insofar as any of the other

21  participants are concerned.  And I can't sit here and just

22  guess at it.  As a matter of fact, if I were asked to guess, it

23  would not go well for the defendant.

24      **MS. ALLRED:**  Understood.  I would call Agent Jason

25  Dufault to the stand.

1    **THE COURT:**  You may proceed.

2                        **JASON DUFAULT,**

3    **having first been duly sworn, testified as follows:**

4                        **DIRECT EXAMINATION**

5    **BY MS. ALLRED:**

6    Q.   Thank you, sir.  Would you state your name, please, for

7    the record?

8    A.   Jason Dufault.

9    Q.   And how are you employed, sir?

10   A.   I'm employed as a Special Agent with the FBI.

11   Q.   How long have you been with the FBI?

12   A.   Approximately three years.

13   Q.   And you are the lead case agent in this case; is that

14   correct?

15   A.   That is correct.

16   Q.   Would you state, please, how your office and you

17   particularly were alerted to how this case began?

18   A.   It originally started in December of 2016.  We had a

19   six-kilo seizure of methamphetamine on I-10, and Tiffany

20   Snodgrass was arrested.  From there, through cell phone

21   extractions and through several statements by Ms. Snodgrass, we

22   identified Alfonso Jaimes and Maria Teresa Duarte as Tiffany's

23   facilitators.

24   Q.   Okay.  Now, we are going to go back to that in a moment,

25   but did your investigation lead you to conclude that prior to

1    her trip to Mississippi, that Ms. Snodgrass was working for

2    some other people involved in drug trafficking?

3    A.   That is correct, yes.

4    Q.   And who are those people?

5    A.   So it's a familial connection to Ms. Duarte.  It is Jacob

6    Duarte and Antonio Duarte Godinez were her original points of

7    contact for this drug trafficking organization.

8    Q.   So would it be fair in saying that when Ms. Snodgrass

9    began, she was working for two men named Otoniel and Jacob?  Is

10   that right?

11   A.   Correct.  Jacob and Tony is what she knew them as.

12   Q.   And these two defendants are related to Ms. Godinez; is

13   that right?

14   A.   Yes.

15   Q.   At some point, Ms. Snodgrass began working or dealing with

16   someone else; is that right?

17   A.   Correct.

18   Q.   And who was that?

19   A.   So after a period of about six to eight months, Ms.

20   Snodgrass was introduced to Ms. Duarte through her brothers.

21   Q.   Okay.  And why did that shift take place?

22   A.   In Ms. Snodgrass' own words, she stated the two brothers

23   weren't looking out for her best interest.  They were -- she

24   quoted saying that she felt like a sitting duck.  Sometimes she

25   would make a drug shipment and be waiting in a parking lot for

1  an extended period of time, and things were not running as

2  smoothly as she would have liked.

3  Q.  Okay.  So she began dealing with Ms. Godinez; is that

4  correct?

5  A.  Yes.

6  Q.  Now, how did Godinez and Ms. Snodgrass communicate?

7  A.  Primarily through -- within her phone, she had three

8  contacts.  One was Teré, the other was Teré2, and the third

9  contact was Teré husband.

10  Q.  Okay.  So let's talk about that.  You obtained phone

11  records for both Ms. Snodgrass and Ms. Godinez and Mr. Jaimes;

12  is that right?

13  A.  I believe so, yes.

14  Q.  And without nailing you down too specifically, can you --

15  approximately how much -- how many contacts were there between

16  Ms. Snodgrass and Ms. Godinez's phone?

17  A.  So it was for just a pretty short duration.  I don't know

18  if -- it was never brought up if Tiffany deleted the contacts

19  on her phone or whatever the case may be, but there were

20  several communications between Snodgrass and Ms. Duarte.

21  Q.  Is it fair to say there were hundreds?  I don't want to

22  put words in your mouth.

23  A.  Certainly from the toll records, but we did a cell phone

24  dump of both of Tiffany's phones, and there were not hundreds

25  of messages between them, but there were several text chains

1  that referenced drug-related activities.

2  Q.  Okay.  And these messages tend to indicate it was Ms.

3  Godinez and not Mr. Jaimes that was arranging for shipments and

4  facilitating these shipments; is that right?

5  A.  That would be correct, yes.

6  Q.  Okay.  Now, in fairness, there were some communications

7  between Ms. Snodgrass and Mr. Jaimes; is that right?

8  A.  Yes.

9  Q.  Okay.  Now, is it also fair to say that in clarifying the

10 reasons for those calls, that Ms. Snodgrass advised that she

11 only called Mr. Jaimes when she needed to get in touch with Ms.

12 Godinez.  Is that fair?

13 A.  That is a fair assessment.  She did also state that when

14 she needed to obtain personal stashes of meth, that she would

15 contact Mr. Jaimes direct.

16 Q.  All right.  And Ms. Snodgrass was a methamphetamine user;

17 is that right?

18 A.  She was.

19 Q.  And do you know if Mr. Jaimes also used methamphetamine?

20 A.  I was not generally aware of his drug habits.

21 Q.  Okay.  Now, did Ms. Snodgrass also advise you of other

22 people that were involved in -- in the organization in Texas?

23 A.  She did.

24 Q.  Can you provide an overall, I guess, description of the

25 organization, perhaps starting here and moving out?

1    A.   Okay.  So we have Ms. Snodgrass, who's the courier that we

2    identified.  Taking that one level further to her facilitators,

3    we identified the two codefendants, along with Jacob Duarte and

4    Antonio Duarte Godinez.  From there, it kind of branched out.

5    We did a phone dump on Ms. Duarte's cell phone post arrest and

6    identified her Mexican source of supply that she was

7    communicating with.  And through some proffers with them, they

8    identified her source of supply.

9        Additionally, there are 43 other subjects related to this

10   DTO that were federally indicted out of the Western District of

11   Texas, so there's a substantial amount of crossover with our

12   three subjects here in Mississippi and with the Western

13   District of Texas.

14   Q.   Okay.  And if I can, let me follow up on a couple of

15   things that you stated.  You stated that based on looking at

16   the phone records, and specifically Ms. Godinez's phone, you

17   were able to identify the source of supply; is that right?

18   A.   Correct.

19   Q.   And there were contacts between Godinez's phone and the

20   source of supply; is that right?

21   A.   Yes.

22   Q.   Are you aware or do you have evidence of any contacts on

23   the part of Mr. Jaimes and any Mexican source of supply?

24   A.   Other than him being referenced by name in numerous

25   conversations with the source of supply and Duarte, I have no

1   evidence that he directly contacted the Mexican source of

2   supply.

3   Q.  Okay.  Well, let's follow up on that.

4   A.  Okay.

5   Q.  There were -- is it fair to say that there were messages

6   on Ms. Godinez's phone with a third party where they asked Mr.

7   Jaimes to transport money and/or drugs?

8   A.  Yes.

9   Q.  Did those messages also indicate that Mr. Jaimes, for

10  various reasons, wasn't going to do that or did not want to do

11  that or would not do that?

12  A.  The one particular example that I read to you, he declined

13  to take that shipment.  There are other text messages where it

14  appears more so related to the money shipment that he did make

15  trips.

16  Q.  Okay.  And to be fair, when you met with Mr. Jaimes --

17          **THE COURT:**  Wait just a minute, because I'm becoming

18  confused.  When you say money shipments, he made trips, are you

19  referring to Mr. Jaimes made trips to deliver money shipments?

20  A.  Yes, Your Honor.

21          **THE COURT:**  To whom?

22          **THE WITNESS:**  They were to recipients that were

23  directed by the Mexican source of supply.

24          **THE COURT:**  But not exclusively to Ms. Snodgrass?

25          **THE WITNESS:**  Correct.  The review period where I'm

1    looking at this activity was a year after Ms. Snodgrass had

2    already been arrested.  This is from 2017.

3            **THE COURT:**  So the conduct that Mr. Jaimes engaged in

4    in delivering monies to Ms. Snodgrass, he also did that with

5    other drug couriers.  Would that be accurate?

6            **MS. ALLRED:**  Well --

7            **THE COURT:**  Wait just a minute now.  Would that be

8    accurate?

9            **THE WITNESS:**  There is some information in the text

10   messages that suggests that he was paying a truck driver

11   courier a percentage to make deliveries, based off of the text

12   conversations.

13           **THE COURT:**  And this is the defendant, Mr. Jaimes?

14           **THE WITNESS:**  Mr. Jaimes is in concert with Ms.

15   Duarte.  At times it's very difficult to separate which one was

16   involved in what activity because he primarily drove for her,

17   and his English was much better.  So he, a lot of times, acted

18   as a translator on her behalf, so it's very difficult for me to

19   accurately assess separate roles, in a sense, because they are

20   together.

21           **THE COURT:**  Fair enough.  Go ahead.

22   BY MS. ALLRED:

23    Q.  And to follow up on those questions, when you take a step

24   back looking at relative roles, would you have described Mr.

25   Jaimes as being on equal footing with his wife, or with the

1   brothers, or would you have described him as a different sort

2   of role?

3   A.   Right.  I believe that Ms. Duarte, by all accounts, she

4   did the bookkeeping for the U.S. segment of this drug

5   trafficking organization.  He did not work in that capacity.

6   His roles were much more of kind of a worker bee.  He would do

7   things with Ms. Duarte, but he, I don't believe, had the level

8   of responsibility where he was accounting for money and drug

9   amounts or logistics or anything like that.

10  Q.   Okay.  And that leads me to another question of what you

11  testified to.  You know, you said that Ms. Snodgrass -- I guess

12  you lumped Ms. Jaimes in as a -- Mr. Jaimes in as a facilitator

13  with his wife, but the facilitating was actually done by whom

14  in this case?

15  A.   I guess it depends on what the definition of facilitating

16  is.

17  Q.   Who made arrangements for pickups?

18  A.   So Maria would organize -- from my understanding, she

19  would call Tiffany and say, we need -- you know, this is just

20  an example -- we need six kilos shipped to Atlanta, and it

21  would be Maria that would handle the logistics segment of that.

22       Now, as far as whoever met up with Tiffany to pay her for

23  her services after she made the trip, both of them would be

24  together.  So if he is a facilitator in that sense, he is

25  paying her for her shipment, but he's not doing the main

1  administrative logistics that is required with these drug

2  shipments.

3  Q.  Okay.  Did he have any sort of ownership interest in the

4  shipments?

5  A.  In the sense was he profiting from that activity?

6  Q.  They weren't his drugs, were they?

7  A.  They were not his drugs.  They were not his drugs.

8  Q.  Did he have any decision-making authority or discretion

9  concerning how these -- I guess how the organization operated?

10  A.  Not in my investigation, I did not determine that.

11  Q.  Okay.  Were there statements made by Ms. Snodgrass based

12  on her observation of how everything worked and went down that

13  the others sort of didn't want to give Mr. Jaimes a very

14  important role, based on his drinking?

15  A.  Right.  She had made the comment that he wanted a higher

16  role in the organization, but they would not allow for it, and

17  that he was really a nobody, in her words, as far as this drug

18  trafficking organization was concerned.

19  Q.  Okay.  And that's what Ms. Snodgrass said.  She referred

20  to him in the context of this organization to be nobody.  Is

21  that --

22  A.  Yes.

23  Q.  Okay.  Now, you testified that -- let me ask you, if I

24  can, to sort of help create a big picture of hierarchy, if I

25  can.  If you were to pinpoint who would be sort of at the top

1  of this organization in terms of responsibility for the drugs

2  or top of the food chain, if you will, just for lack of a

3  better word, who would you put at the top from who you know

4  that was involved?

5  A.  Based on who I know, it's the Mexican source of supply

6  that was communicating with Ms. Duarte, and he was identified

7  as Alejandro Viagas.

8  Q.  Okay.  And underneath him, to the extent of your

9  investigation, it would have involved who?

10  A.  He was communicating to Maria, who in turn would -- in my

11  investigative opinion, I believe that her two brothers and her

12  were essentially on the same footing.

13  Q.  Okay.  But then there were also others involved as well.

14  There were certain cousins, were there not, of the Duarte

15  Godinezes?

16  A.  Right.

17  Q.  And who were those people?

18  A.  So there was Guillermo Juarez and Alejandro Mesa Palisios.

19  They were two relatives.  I'm not sure if Guillermo actually

20  was a relative of hers, but they were the cooks in a sense.

21  They transferred the methamphetamine from liquid to crystal

22  form in a clandestine lab in Cedar Creek, Texas.  So there were

23  numerous players involved in the Austin area in this DTO.  I

24  mean, like I said, 43 people were federally indicted out of

25  Texas.  So in the grand scheme of this conspiracy, I would

1  characterize Mr. Jaimes' role as a relatively low player in the
2  grand scheme of the conspiracy.
3  Q.  Okay.  And in fact, there were times, were there not, when
4  Ms. Godinez and Mr. Jaimes weren't together.  They had split
5  up; is that correct?
6  A.  On occasion, there were times.
7  Q.  Right.  And there was even a period when he was
8  incarcerated, a brief period during this offense conduct when
9  he was in jail; is that right?
10  A.  Right, on December 14th of 2016.  He was arrested for a
11  driving under suspension violation.
12  Q.  Based on the intel that you have received, during those
13  periods when Godinez and Jaimes were on the outs, and while he
14  was in jail, did operations continue, business as usual, even
15  in his absence?
16  A.  Yes.
17  Q.  Okay.  Now, one of the brothers, let's talk a little bit
18  about one of the brothers, Otoniel.  Am I saying that right?
19  Is that the right name?  Otoniel?
20  A.  I believe Otoniel.
21  Q.  Otoniel?
22        **MS. ALLRED:**  I should probably ask you, Judge, the
23  correct pronunciation of that.
24  **BY MS. ALLRED:**
25  Q.  But Otoniel --

1    A.   Yes.

2    Q.   -- he was arrested in Texas; is that correct?

3    A.   That's correct.

4    Q.   And he was arrested selling two kilograms of

5    methamphetamine; is that right?

6    A.   From my understanding, it was two kilograms.  I know you

7    had brought up a higher value.  I'm not aware of any other

8    information.

9    Q.   Okay.  But in any event, he was arrested and charged

10   federally in this case; is that right?

11   A.   Correct.

12   Q.   And he received 135 months as his sentence; is that right?

13   A.   I have not seen -- I've just -- I was told by you that

14   that was the time he received, yes.

15             **MS. ALLRED:**  May I approach?

16             **THE COURT:**  You may.

17   A.   And this is a possession charge, not a conspiracy charge,

18   so it's a different offense that he's been charged with, but,

19   yes, he got 133 months.

20   **BY MS. ALLRED:**

21   Q.   Okay.  And that's a valid point.  He was ultimately

22   charged and pled guilty to possession with intent to

23   distribute, right, instead of the conspiracy?

24   A.   Yes.

25   Q.   But based on your investigation of the case, would you say

1  that Otoniel Duarte Godinez was higher up in the organization

2  than Mr. Jaimes?

3  A.  Certainly higher up than Mr. Jaimes, yes.

4        **MS. ALLRED:**  May I approach to retrieve that?

5        **THE COURT:**  Sure.

6        **MS. ALLRED:**  If I could have just a moment, Your

7  Honor.

8        **THE COURT:**  Sure.

9  **BY MS. ALLRED:**

10  Q.  Now, you referenced some brothers that were -- I'm sorry,

11  some relatives that were possibly cooking up or rocking up the

12  methamphetamine once it came to --

13  A.  Yes.

14  Q.  All right.  Where would you put them in the hierarchy,

15  starting with the Mexican source and then going down to the --

16  Ms. Godinez's brothers and Ms. Godinez?  Where did they fall?

17  A.  That would be difficult to make a really -- to

18  differentiate between their roles and, say, that of Jacob, Tony

19  and Maria.

20  Q.  Okay.

21  A.  It would be difficult to make an assessment.

22  Q.  Okay.  But based on your testimony, you do not consider

23  Mr. Jaimes' role in the offense to be on par with those

24  brothers and Maria; is that fair?

25  A.  From what I know about it, there's nothing that I could

1    say he was necessarily on the same level as those other

2    players.  But like I said earlier, according to Tiffany's own

3    admission, he accompanied Maria on 80 percent of the times, so

4    it's difficult to really separate their two roles when we are

5    talking about the facilitation of drug shipments.

6    Q.   Sure.  Well, Ms. Snodgrass, who we've all had an

7    opportunity to interview, she did not have a problem

8    differentiating between their roles, did she?  Who did she work

9    for, based on her own statements?

10   A.   What she stated is she worked for Teré, yes.

11   Q.   And she described Mr. Jaimes as -- what were your words?

12   A.   She described him as a nobody.

13        **MS. ALLRED:**  No further questions.

14        **THE COURT:**  Mr. Pisarich, do you wish to ask this

15   witness any questions?

16        **MR. PISARICH:**  Could I ask a couple of questions,

17   Your Honor?

18        **THE COURT:**  Sure.

19                    **CROSS-EXAMINATION**

20   BY MR. PISARICH:

21   Q.   Before my client, Ms. Godinez, got involved in this drug

22   trafficking organization, it was more or less, at least in the

23   U.S., being run by her brothers; is that correct?

24   A.   Correct.

25   Q.   All right.  And at some point in time, and I want to go

1    quickly here, there came a time when Ms. Snodgrass became

2    disenchanted with them as far as how they were handling her,

3    correct?

4    A.  Yes.

5    Q.  And then Ms. Godinez basically came in between the two of

6    them; is that correct?

7    A.  Yes.

8    Q.  All right.  Do you have any information that Ms. Godinez

9    was involved with this drug trafficking organization prior to

10   that time?

11   A.  No, I don't.

12   Q.  Okay.  And would you at least -- so whatever time Ms.

13   Snodgrass said she began working back with the organization

14   after she had a falling out with the brothers, that would have

15   been the beginning point in time as far as Ms. Godinez working

16   for the organization; is that not correct?

17   A.  That is correct.

18   Q.  All right.  At the time even after she became working with

19   the organization, would you put her at least under a rung, as

20   far as the chain of command, as far as under her brothers?

21   A.  I think they had separate roles.  She was -- she presented

22   as the accountant for this drug trafficking organization.

23   Q.  Right.

24   A.  I have drug ledgers that we recovered from her phone that

25   an expert at the Cryptanalysis and Records Racketeering Unit at

1    the FBI lab determined were ledgers for methamphetamine.  I

2    have 137 pages of text messages between Ms. Duarte and her

3    Mexican source of supply, so it's difficult for me to determine

4    that her role was lesser than theirs because they had different

5    roles in this organization.

6    Q.  I'm not trying to win her a minor participant role here.

7    I'm just trying to put it in terms of hierarchy.  In other

8    words, before she got involved, the brothers were there, and

9    then Ms. Snodgrass.  And then she got involved, and the

10    brothers were still there, and Ms. Snodgrass started back.

11    That's what I'm getting at.  Wouldn't she be somewhere in

12    between?  Not saying she is a minor participant.  I'm not

13    trying to argue that.

14    A.  Um-hm.  So the information that I have, yes, they were

15    involved in the conspiracy a lot longer than she was, in my

16    opinion.

17    Q.  Okay.  And by the way, you mentioned about the drug or the

18    wire transfers of money down to Mexico, right?

19    A.  Yes.

20    Q.  It was somewhere in the nature of about 150 of them, were

21    there not?

22    A.  Yes.

23    Q.  And none of them -- none of any individual one was over a

24    thousand dollars, was it?

25    A.  Correct.

1          **MR. PISARICH:**  I don't have any questions.

2          **THE COURT:**  Do you have any questions for the

3     witness, Ms. Cole?

4          **MS. COLE:**  No, Your Honor.

5          **THE COURT:**  Agent Dufault, I have some questions.

6          **THE WITNESS:**  Yes, sir.

7          **THE COURT:**  Now, I was unaware that there was an

8     investigation, and I don't know whether it is completed or not,

9     in the Western District of Texas.  And what I'm trying to

10    determine here is whether there's any evidence that I can hang

11    my hat on that would tend to show that this defendant is

12    substantially less culpable than others.  And what I have right

13    now is Ms. Snodgrass' participation.

14         Were you able to identify or were you able to determine

15    whether or not Ms. Godinez and Mr. Jaimes had other couriers

16    that worked for them other than Ms. Snodgrass?

17         **THE WITNESS:**  So with the examination of the text

18    messages that were recovered from her phone, they make numerous

19    references to a truck driver.  And from proffers and other

20    things, we determined that that was another courier that was

21    involved in this drug trafficking organization.  So I do have

22    information to suggest that they were not exclusively dealing

23    with Ms. Snodgrass, as far as transporting money and drugs.

24         **THE COURT:**  So you can identify at least one

25    additional courier?

1        **THE WITNESS:** Yes, Your Honor.

2        **THE COURT:** But you can't tell me one way or the

3   other whether there were one or ten or twenty?

4        **THE WITNESS:** Correct.

5        **THE COURT:** And you cannot tell me what Mr. Jaimes'

6   participation would have been insofar as those other couriers

7   were concerned, one way or the other?

8        **THE WITNESS:** Correct, Your Honor.

9        **THE COURT:** It would be -- on my part, I would have

10  to speculate that it's either more involved or less involved or

11  the same amount involved as it was with Ms. Snodgrass? That's

12  all I've got?

13       **THE WITNESS:** Yes, Your Honor.

14       **THE COURT:** All right. Thank you. You may step

15  down. Who is your next witness?

16       **MS. ALLRED:** I don't intend to call any additional

17  witnesses.

18       **THE COURT:** Does the government intend to call any

19  witnesses?

20       **MS. COLE:** No, Your Honor.

21       **THE COURT:** And Mr. Pisarich, do you intend to call

22  any witnesses?

23       **MR. PISARICH:** No, Your Honor.

24       **THE COURT:** All right. Let me take these objections,

25  then, one at a time as they relate to both of the defendants.

1  There's an objection as to the inclusion of an enhancement for

2  the possession of a firearm.  The firearm was in the possession

3  of Ms. Snodgrass at the time that she was arrested.  And I

4  think even the stipulation of Ms. Snodgrass' testimony would

5  tend to show that she was, in fact, in possession of that

6  firearm, and that both defendants, Ms. Godinez and Mr. Jaimes,

7  were aware that she possessed a firearm.  It was possessed

8  during a drug trafficking offense, and not only was it

9  reasonably foreseeable by both of these defendants that one of

10  their co-conspirators would possess it, but they actually knew

11  that she possessed a firearm during and in relation to the drug

12  activities.  Therefore, that objection is overruled as to both

13  defendants.

14       With regard to the defendant Mr. Jaimes' objections to the

15  calculation regarding his entitlement to a minor participant,

16  that objection is overruled.  The burden is on the defendant to

17  prove by a preponderance of the evidence that he is

18  substantially less culpable than any of the other participants

19  within this -- what by all appearances is a mass -- massive

20  conspiracy.  I am not impressed by the government's concession

21  that Mr. Jaimes is less culpable, substantially less so than

22  anyone else, and I am not impressed by the absence of evidence

23  for me to speculate that his participation was limited only to

24  his involvement with Ms. Snodgrass.  In fact, my experience

25  tells me that I can certainly infer that Mr. Jaimes'

1    participation, which even by Ms. Snodgrass has been

2    characterized as a facilitation by translation and exchange of

3    money, but that same facilitation and that same participation

4    would have been extended to the other couriers and to the other

5    hierarchy contained in the -- within the organization.

6         It is my conclusion and it is my finding that the

7    defendant has failed to demonstrate by a preponderance of the

8    evidence that he is substantially less culpable than any of the

9    other participants.  That objection is overruled.

10        Insofar as the calculation of the guidelines are

11   concerned, I will take these one at a time, and then we will

12   move on to the statutory sentencing factors.  Let me get my

13   work station put together here a little bit better.

14        The Court has ruled on the objections insofar as the case

15   of United States versus Alfonso Fonty Jaimes.  I do adopt the

16   presentence investigation report without change, having ruled

17   on the objections made by the defendant.  I do note for

18   purposes of the record that the account of conviction does

19   carry a mandatory minimum term of imprisonment.  I also find

20   that by applying the facts contained in the presentence

21   investigation report and the facts adduced here at the hearing

22   that the total offense level is a level 39, with a criminal

23   history category of IV.  This yields, under the guidelines, a

24   sentencing imprisonment range of 360 months to life

25   imprisonment, supervised release range of five years, a fine

1   range of 50,000 to $10 million, and the Court is aware of no

2   additional materials which would justify a departure under the

3   provisions of the advisory guidelines.

4       Insofar as the case of United States of America versus

5   Maria Teresa Duarte Godinez, the Court does adopt the

6   presentence investigation report without change.  Having ruled

7   on the objections made, the Court finds that the case does

8   involve a mandatory minimum sentence under the provisions of

9   the statute.  I also find that by applying the facts as

10  contained in the presentence investigation report, as well as

11  the facts and evidence adduced here at the hearing, that the

12  total offense level in this case is a level 39, criminal

13  history category of I.  This yields a sentencing imprisonment

14  range of 362 to -- 262, I'm sorry, 262 to 327 months

15  imprisonment, supervised release range of five years, a fine

16  range of 50,000 to $10 million, and the Court is aware of no

17  additional materials which would justify a departure under the

18  provisions of the advisory guidelines.

19      Insofar as the defendant, Mr. Jaimes, is concerned, Ms.

20  Allred, do you intend to offer any additional materials which

21  would touch upon the statutory sentencing factors that the

22  Court will consider?

23          **MS. ALLRED:**  Your Honor, we submitted a sentencing

24  memorandum on Mr. Jaimes' behalf I believe Monday.  We would

25  ask the Court to consider that.  And then we would ask the

1    Court to consider -- I don't know whether it needs to be by way

2    of an exhibit, but there is certainly no harm in admitting it,

3    the judgment in the case against Otoniel Duarte Godinez,

4    because I think it speaks to the sentencing factor concerning

5    the need to avoid unwarranted disparity in sentencing, and so

6    we would submit that as an exhibit.

7            **THE COURT:**  All right.  Any objection?

8            **MS. COLE:**  No, Your Honor.

9            **THE COURT:**  It will be marked and admitted.

10           **MS. ALLRED:**  May I approach?

11           **THE COURT:**  Yes.

12        **(EXHIBIT D-2 MARKED)**

13           **MS. ALLRED:**  And other than argument, I don't intend

14    to submit any more evidence.

15           **THE COURT:**  All right.  I've got --

16           **MS. ALLRED:**  Oh, the letters of support, Your Honor,

17    that were submitted additionally.  I forgot about that.  We

18    would ask the Court to consider those.

19           **THE COURT:**  I have a series of letters, quite

20    frankly, on behalf of both defendants, and I would ask that the

21    clerk make them a part of the record in support of both of the

22    defendants.  I want to be sure I get all of them in the record.

23    I don't want to leave any of them out.  They are quite

24    voluminous, frankly.  I think I've got them all.

25        Other than argument, Ms. Allred, anything else on behalf

1  of Mr. Jaimes?

2          **MS. ALLRED:**  No, sir.

3          **THE COURT:**  Mr. Pisarich, I will ask you, sir, do you

4  intend to offer any additional materials which touch upon the

5  statutory sentencing factors, other than the letters --

6          **MR. PISARICH:**  No, Your Honor, other than the

7  letters.  Just one thing, Your Honor, we do want to have into

8  the record.  While she was incarcerated, she did complete two

9  programs, and I would like the Court to be aware of that, if

10 the Court please.  May I approach and have these admitted?

11         **THE COURT:**  Certainly.  Do you want me to keep those

12 copies?  Are those copies for the record?

13         **MR. PISARICH:**  These are the copies for the record.

14         **THE COURT:**  Any objection?

15         **MS. COLE:**  No, Your Honor.

16         **THE COURT:**  They will be marked and admitted.

17         **MR. PISARICH:**  There is a Certificate of Completion

18 here, if the Court please, to the story of Jesus' life that she

19 completed in October of 2018.  There is also another

20 Certificate of Achievement from the Good News Jail and Prison

21 Ministry that she completed on August 17th of 2018.  We will

22 make that an exhibit as well, if you please.

23         **THE COURT:**  It will be a collective exhibit as

24 Defense Exhibit Number 2.

25         **THE CLERK:**  It will be D2-1.

1        **(EXHIBIT D2-1 MARKED)**

2            **MR. PISARICH:**  Your Honor, before I sit down, we do

3    have a motion for variance, a motion for downward departure,

4    whenever that would come about.  I just want to make the Court

5    aware of it.

6            **THE COURT:**  Well, insofar as evidence is concerned,

7    insofar as materials are concerned that the Court would

8    consider, is there any additional evidence?

9            **MR. PISARICH:**  No, Your Honor.

10           **THE COURT:**  All right.  I will hear argument and Rule

11   32 argument on behalf of both defendants here shortly.

12       Ms. Cole, on behalf of the government, are there any

13   additional materials that the government intends to offer that

14   touch on the statutory sentencing factors.

15           **MS. COLE:**  No, sir, Your Honor.  Just pursuant to the

16   plea agreement, the government will recommend that the Court

17   sentence both of these defendants within the lower 25 percent

18   of the guidelines range.

19           **MS. ALLRED:**  Your Honor, out of an abundance of

20   caution, Mr. Jaimes -- it was mentioned in our sentencing memo,

21   so it may be a little bit redundant, but we also have

22   certificates of his Bible study.  If I could, I would rather

23   proffer into the record that he participated in weekly Bible

24   study for most of the entire time that he was in Harrison

25   County, beginning in February of 2010 up through July of this

1  year.  And if the government will stipulate to that, then I

2  won't feel the need to put the records themselves into

3  evidence.

4  **THE COURT:**  That is a fair request.  Do you stipulate

5  that, Ms. Cole?

6  **MS. COLE:**  Yes, Your Honor.  What were --

7  **THE COURT:**  I will consider that as part of the

8  record, the completion of those two programs.

9  **MS. ALLRED:**  Yes, sir.  In fairness to the

10  government, though, I just want to make sure that she has seen

11  them and is okay with them.

12  **THE COURT:**  Go ahead.

13  **MS. ALLRED:**  Thank you, sir.  And I did misstate the

14  date.  It is 2018.

15  **THE COURT:**  All right.  Pursuant to Rule 32, Ms.

16  Allred, is there anything else that you wish to argue on behalf

17  of sentencing insofar as Mr. Jaimes is concerned?

18  **MS. ALLRED:**  There is, Your Honor.  We too have filed

19  a sentencing memorandum asking for a variance in this case, and

20  we think it is appropriate for another factor -- for a number

21  of factors.

22  I recognize and respect the Court's ruling concerning

23  minor role, and I think that what the parties were attempting

24  to achieve in this case was a resolution that somehow took into

25  consideration the relative roles of the people involved in this

1  organization, starting from the top down to the people who were

2  actually doing the negotiations and the logistics and rocking

3  it up, to the couriers and to Mr. Jaimes, taking not only into

4  consideration what it is that they did but how long they did it

5  as well.

6        In Mr. Jaimes' case, he was incarcerated until I

7  believe -- I have the date of April of 2015, but I'm not sure

8  that's a correct date.  We can fairly say, however, that up

9  until not long before Ms. Snodgrass was arrested, he was either

10  on the run in Mexico, or when he came and turned himself in,

11  serving a time in Texas Department of Corrections.  So his

12  conduct in this case, I would be surprised if it exceeded the

13  scope of two years.  Okay?  I think it is much less than that.

14        And we can't necessarily say that he was participating

15  with -- as Ms. Godinez's boyfriend prior to the time that they

16  got married because he was incarcerated, and they got married I

17  think shortly after his release, in September.  He's writing me

18  a note.  He's reminding me that even after he was locked up, he

19  was in a halfway house, which even further narrows the time he

20  would have participated in this.

21        Now, Mr. Jaimes is guilty of a crime and he pled guilty.

22  He participated in what was a widespread drug trafficking

23  organization, but he was nowhere near the top.  He wasn't

24  directly at the bottom, but he was lower than many of these

25  other participants in terms of decision-making authority,

1   proprietary interest in the drugs. In terms of being essential

2   to the things that went on, he was not essential. He was

3   expendable. And that is proven by the fact that the drug

4   trafficking organization and their activities continued even

5   when he wasn't in the picture, when he and his wife were split

6   up or when he was arrested. It is without argument that at the

7   time Ms. Snodgrass took her last run, Mr. Jaimes was in jail,

8   and things continued on perfectly well without him.

9       He deserves to be punished. He recognizes that. I

10   recognize that. But when you take a step back and you look at

11   the length that he was involved and the fact that but for his

12   relationship with his wife, I'm not sure that he would be in

13   this particular entanglement right here. I think that that

14   deserves some thought in terms of the sentencing. And perhaps

15   most troubling to me is the fact that someone who is pretty

16   high up on the food chain, one of the brothers, one of the

17   brothers that Ms. Snodgrass was working for before Ms. Godinez

18   got on the scene, before Mr. Jaimes got out of jail, he did a

19   sentence of 135 months. I believe it was a downward departure

20   from a guideline range of approximately 210. He did not

21   cooperate, and he didn't even sign a plea agreement.

22       So what I'm asking for --

23           **THE COURT:** Was that a variance then?

24           **MS. ALLRED:** It was a variance.

25           **THE COURT:** All right.

1      **MS. ALLRED:**  And what I'm asking for is parity,

2  something that takes into consideration while he may not

3  technically meet the definition of a minor role, that catches

4  the flavor of what it was.  He was definitely involved.  I

5  think Ms. Snodgrass' words for what it was:  Did he make

6  decisions?  No.  Did he help get things done?  Yes.  But one of

7  the people who was making decisions got 135 months.  And that

8  troubles me greatly, okay, because geography shouldn't play a

9  part.

10      **THE COURT:**  Did you tell me or do you know —— it's

11  likely that you do not know.  At the time that this individual

12  would have been sentenced, if it were a variance, then there

13  would have been a reason for the variance.  Do you have any

14  idea what the reason for the variance was?  The Court would

15  have articulated or should have articulated a reason for that

16  variance.

17      **MS. ALLRED:**  I don't want to misspeak.  I can tell

18  you what I know and who it came from, and you can consider it

19  for what it's worth.  I did not learn until last night that

20  Otoniel Duarte Godinez had actually already been sentenced in

21  Texas.  He was sentenced, I believe, in November.  So this

22  morning prior to Court, I reached out to the Public Defender

23  who represented Mr. Duarte Godinez, and he said that he filed a

24  big sentencing memorandum based on the idea that the guidelines

25  are just too high for a nonviolent drug offender.

1    And so I think it possibly was -- it's just you look at

2    it, and it just doesn't sit right to think that this is the

3    sentence that he is facing.  But my concern is parity, and I

4    recognize that that cuts both ways because we have a courier

5    who received a very long sentence, but I anticipate that she

6    will receive a reduction in that sentence based on her

7    cooperation in this case.

8    But -- so when you are comparing apples to apples, even if

9    you took Duarte Godinez's guideline range and brought it all

10   the way back to category I, his guideline sentence, Mr. Alfonso

11   Jaimes' guideline sentence is still twice what Mr. Duarte

12   Godinez received in Texas, and that's a big problem for me.

13   And I submit that a variance is appropriate in this case to

14   take into consideration the relative roles that each one of

15   these played.

16   And finally, I really do want to be clear that I'm not

17   downplaying what Mr. Jaimes did.  And all he has asked for all

18   along is for the presentence report and his plea to reflect

19   those things that he actually engaged in.  And if he's going to

20   be held accountable for the global conspiracy, all of the drugs

21   that Ms. Snodgrass did and all of Ms. Snodgrass' conduct, then

22   it should also take into consideration what his relative role

23   was.

24   **THE COURT:**  All right.  As always, Ms. Allred, you

25   are very articulate and candid in your arguments, and I do

1   appreciate them.

2      Mr. Pisarich, is there anything else under Rule 32, any

3   other additional comment that you wish to make before I proceed

4   to allocution?

5          **MR. PISARICH:** Relative to the motion to variance and

6   downward departure, Your Honor. As Your Honor well knows, but

7   just to reiterate all of this, my client is not a U.S. citizen.

8   She is a Mexican national. And in all likelihood, whatever the

9   sentence pronounces, at the end of that sentence, she is going

10   to be deported back to Mexico.

11      The situation as far as her category history, she's a I.

12   If you look at the presentence investigation report, she's had

13   one other arrest, and that was back in 2013, where she

14   attempted to get in the United States by declaring -- for

15   asylum, and she was arrested at that point, and that's the

16   process I guess they go through there. There was no conviction

17   to it. In any event, she is a category history I, no other

18   arrest other than the other arrest I'm talking about that was

19   in the presentence investigation report.

20      Look at the cost of incarceration relative to this matter

21   here. According to the presentence investigation report,

22   $36,300 a month for somebody imprisoned or incarceration.

23      Look at how my client basically got involved with the

24   agent, even testified to. She got involved in this situation

25   as a result of a dispute between people that were involved in

1  the conspiracy, that being her two brothers and Ms. Snodgrass.

2  Had it not been for that dispute, I will just call it a

3  dispute, my client might not have ever been involved in the

4  drug trafficking organization.

5      And also, Your Honor, this was not a big moneymaker

6  operation for either my client, and I'm assuming it for Mr.

7  Jaimes as well.

8      The kind of exposure they placed themselves to and under

9  for the kind of money I guess that they made was just a penance

10  of -- these people weren't making ten or twenty thousand,

11  thirty thousand a month or a hundred thousand or that type

12  situation.  As far as their share, they got relatively small

13  amounts of money in that regard.

14      Also, Your Honor, for Ms. Godinez, we would join in the

15  arguments of Ms. Allred relative to the sentence of the

16  brother, Otoniel, out there in Texas, of 135 months, as far as

17  parity.

18      One other thing, Your Honor, I wanted to just reiterate.

19  And again, this comes from the report that I received, and

20  that's one of the reasons why -- although I withdrew it, and I

21  think that I was right in withdrawing it, and I appreciate the

22  candor the Court had relative to the minor role participant,

23  but I hope, Your Honor, even relative to that, as far as a

24  variance, would take note of paragraph 56 in the report, where

25  it states, "The case agent stated that while her role was more

1  than that of a courier, (such as Snodgrass), she," referring to

2  Ms. Godinez, "was not in charge of operations. Godinez did not

3  make assignments, did not recruit accomplices, did not receive

4  a larger share of the profits or have decision-making

5  authority. The case agent advised that Godinez would receive

6  directions from the leader of the DTO."

7      I just wanted to bring that to the attention of the Court,

8  not trying to argue anything relative to that as far as role in

9  the offense. But when you take all of those things into

10 consideration -- and I think one of the things is the fact that

11 this is really, for all intents and purposes, her first arrest.

12 And for her to be looking at a sentence within the range of 262

13 to 327 appears to be, I would say, a little harsh, but it

14 appears to be way too harsh, and I would ask the Court to

15 consider all of these matters and to consider a reasonable

16 departure downward, insofar a variance, to give her something

17 that I consider to be reasonable, and knowing quite well,

18 knowing quite well that whatever sentence Your Honor is going

19 to give her, at the end of it, she is going back to Mexico.

20      **THE COURT:** Thank you, Mr. Pisarich. All right. Mr.

21 Jaimes, you have the right, sir, on your own behalf to say

22 anything that you wish to say before the Court imposes a

23 sentence for as long as you wish to say it. Is there anything

24 that you would like to say?

25      **DEFENDANT JAIMES:** Yes, sir. I got something

1   written, but I got something in my heart I got to speak at.

2           **THE COURT:**  Go ahead.

3           **DEFENDANT JAIMES:**  Your Honor, I know what I did was

4   wrong.  I know that.  After years of being incarcerated, I see

5   things aren't going to work out the way I was hoping.  To clear

6   up the air, when I talked to the agent and when I talk to my

7   lawyer and I told them everything I done, I been honest ever

8   since.  Just like this lady, Ms. Snodgrass is telling you what

9   I done, I done it.  And as I told the agent, the only time I

10  touched any kind of monies was when I was went from northern

11  Texas to McCavern, didn't know where the money was coming from.

12  I might have had an idea, but I never touched no dope or

13  nothing.  My involvement was the money part, and I done that a

14  couple of times.

15      I'm guilty, I'm guilty of it, but when I'm hearing 30

16  years and stuff like that, that's my whole life.  I know I'm

17  guilty, and I know come from a past, I'm a drug addict, and I

18  had a bad past, and I'm not blaming anybody for that.  I'm

19  asking you to have consideration.  That's a long time.  And

20  I've been cooperating with the agent over there, and I've been

21  asking my attorney for the last six months to come on my phone

22  because I got the information to help them out, because I

23  really want to help out to the point where I want everything

24  cleared up.  That's all I got to say.  I'm guilty, but just

25  like I said, God put Your Honor -- he puts all of y'all here in

1    y'all position because y'all are my authority, and I respect

2    it, but I ask for some kind of consideration because this is

3    hard to swallow.  I'm a man and I'm owning up for what I done,

4    and I want to accept that.  But like I said, I got a part in

5    it, and God willing, I could have -- I'm really not that person

6    they paint I was.  And I'm grateful to have a good lawyer

7    fighting for me.

8        The paper right here says, Your Honor, as God is my

9    witness, I come before you humbled and ashamed of my actions.

10   I'm deeply sorry for hurting all the families directly or

11   indirectly with my actions and deeds.  I just hope I can be

12   forgiven by those in the community because I know my ways are

13   not what they should have been.  Now I'm going to look up and

14   use all the help and resources in my reach to better myself as

15   a son, a brother, a husband and a father.  And above all, to be

16   a rightful part of my community.  I also want to express my

17   respect and admiration to those who work and make an honest

18   living.  I know if they can do it, so can I, with the help of

19   my God and the support of my community.

20       I sincerely apologize to the community and Your Honor.

21   This is not something that you might not hear every day, but it

22   is just being honest.  I want today, tomorrow to be able to lay

23   down with the conscience that, you know, what I done, I'm going

24   to be punished for it.  I'm not saying I don't.  At the same

25   time, I want to live my life over, Your Honor.  And Your Honor,

1   I apologize.

2       **THE COURT:** All right. Ms. Godinez, you also have

3 the right to speak on your own behalf, that is to say anything

4 that you wish to say in mitigation of the sentence. Is there

5 anything that you wish to say?

6       **MR. PISARICH:** Your Honor, she wants it translated.

7 She is going to speak in Spanish, and it's going to be

8 translated to Your Honor.

9       **THE COURT:** And tell her to speak up because I speak

10 Spanish, and I would like to hear it both ways.

11       **DEFENDANT GODINEZ:** First of all, I would like to say

12 that I'm very ashamed to be in front of you. And I want to ask

13 for forgiveness, because I know I did wrong. And this year and

14 three months I have reflected, and I have participated in every

15 spiritual activity, and I have learned a lot. I have many

16 regrets to have been a part of something that has been

17 affecting society so badly, but also to my family and to me.

18     I feel like not being part of my brother's funeral is very

19 much part of my punishment. Mr. Judge, I ask you to have

20 compassion with my sentencing. I have learned a lot, and I ask

21 for proper opportunity. This is my first and only offense, and

22 I promise you there will never be another one.

23     I want to do everything possible to finish my schooling

24 and to be a good citizen. I want to take care of my family,

25 and one day give me an opportunity to have kids. I will be

1  very grateful.  With all my respects for letting me talk to

2  you.

3  **THE COURT:**  Thank you.  The importation and the

4  distribution of large quantities of drugs into the United

5  States is a high risk occupation.  It's a high risk while it's

6  engaged in, and it's a high risk when defendants find

7  themselves being caught and brought before the bar of justice.

8  I'm going to take a short recess to consider what should be

9  done in this case.  I will be in short recess until I return.

10  **(RECESS TAKEN AT 2:19 P.M. UNTIL 2:36 P.M.)**

11  **THE COURT:**  I'm going to take these one at a time.

12  I'm going to begin with United States versus Maria Teresa

13  Duarte Godinez.  The Court has considered the advisory

14  guideline computations, as well as the other statutory

15  sentencing factors that can be found under Section 3553(a) of

16  Title 18 of the United States Code, and it is the judgment of

17  the Court that the defendant is hereby committed to the custody

18  of the Bureau of Prisons for a term of 262 months as to the

19  single count in the indictment.  Because the minimum and the

20  maximum of the guideline range does exceed 24 months, the Court

21  states that it is imposing this sentence at the lower end, at

22  the lowest end of the advisory sentencing guidelines in

23  compliance with and comporting with the recommendation of the

24  government for a sentence at the lower 25 percentile of the

25  advisory guidelines, and in order to avoid disparate sentencing

1    with similarly situated individuals.

2          I have also, in that regard, considered all of the other

3    aggravating and mitigating circumstances attended in the case.

4    It is further ordered that the defendant will pay a fine in the

5    amount of $7,500 which is due immediately.  Payment of the fine

6    shall begin while the defendant is in custody.  Upon release,

7    any unpaid balance shall be paid at a rate of at least $150 per

8    month, beginning 30 days after release from custody.  This fine

9    is, of course, a downward departure from the applicable

10   advisory guideline range and is based on the defendant's

11   ability to pay.  The Court finds that the defendant does not

12   have the ability to pay interest on this fine.  Therefore,

13   interest is waived.  In the event that the fine is not paid in

14   full prior to termination of supervised release, the defendant

15   is ordered to enter into a written agreement with the financial

16   litigation unit of the United States Attorney's office for

17   payment of the remaining balance.

18         Additionally, the value of any future discovered assets

19   may be applied to offset the balance of the criminal monetary

20   penalties.  The defendant may be included in the Treasury

21   Offset Program allowing qualified federal benefits to be

22   applied to offset the balance of the criminal monetary

23   penalties.

24         Upon release from imprisonment, the defendant shall be

25   placed on supervised release for a term of five years.  Within

1    72 hours of release from the custody of the Bureau of Prisons,

2    the defendant shall report in person to the probation office in

3    the district to which she is released, if not deported.

4        While on supervised release, the defendant shall comply

5    with the mandatory and the standard conditions that have been

6    adopted by the Court and shall not possess a firearm.

7        In addition, the following special condition is imposed:

8    Number one, at the completion of the defendant's term of

9    imprisonment, the defendant shall be surrendered to the custody

10   of the Immigration & Customs Enforcement for removal

11   proceedings consistent with the Immigration and Nationality

12   Act.  If removed, the defendant shall not reenter the United

13   States without the written permission of the Secretary of

14   Homeland Security.  The term of supervised release shall be

15   non-reporting while the defendant resides outside of the United

16   States.  If the defendant reenters the United States within the

17   term of supervised release, she is to report to the nearest

18   United States Probation Office within 72 hours of her arrival.

19       The Court notes for purposes of the record that if it has

20   erred in the treatment of any of the guideline applications in

21   this case, that the Court would have imposed an identical

22   sentence pursuant to any available variance, which would have

23   been based upon the offense conduct in the case, the

24   characteristics of the defendant, and all other factors,

25   aggravating or mitigating, which can be found under Section

1  3553 of Title 18 of the United States Code.

2       I will recommend that the defendant be housed in a

3  facility closest to her home for purposes of visitation and

4  that she be allowed to participate in the Bureau of Prisons

5  500-hour drug treatment program.  Anything else on behalf of

6  the government?

7            **MS. COLE:**  No, Your Honor.

8            **PROBATION OFFICER:**  I'm sorry, Your Honor.  I did not

9  write down whether a special assessment was imposed in this

10  case.  I don't remember if the Court did it or not.

11            **THE COURT:**  I may not have included that, but she is

12  ordered to pay the mandatory special assessment in the amount

13  of $100.  That is due immediately.  How did I miss that?

14  Anything else on behalf of the government, did you say, Ms.

15  Cole?

16            **MS. COLE:**  No, Your Honor.

17            **THE COURT:**  Anything else on behalf of the defendant,

18  Mr. Pisarich?

19            **MR. PISARICH:**  Nothing, Your Honor, other than -- I

20  think I noted to the probation officer the new address or

21  address in California that she wanted to have referenced as her

22  home address.  Is that noted?

23            **THE COURT:**  She will be interviewed by the Bureau of

24  Prisons before she is designated to an institution.  She will

25  need to be sure to tell them what her home address is.

1          **PROBATION OFFICER:**  I would just say, there is an

2     address in the presentence report of a California address, so I

3     believe that has been taken care of.

4          **MR. PISARICH:**  Very well.  That's all, Your Honor.

5          **THE COURT:**  Thank you, Mr. Pisarich.

6     I will take up next, United States of America versus

7     Alfonso Fonty Jaimes.

8          The Court has considered the advisory sentencing

9     guidelines and the other sentencing factors that can be found

10     under Section 3553(a) of Title 18 of the United States Code,

11     and it is the judgment of the Court that the defendant is

12     hereby committed to the custody of the Bureau of Prisons to be

13     imprisoned for a term of 262 months.  The Court notes for

14     purposes of the record that this constitutes a substantial

15     variance.  It is a variance downward from the applicable

16     advisory Federal Sentencing Guidelines.  The Court notes that

17     the purpose of this variance is to avoid disparate treatment of

18     this defendant, that is, a sentence that is more severe than

19     similarly situated defendants, and it is well within or below,

20     actually, the recommendation of the government of a sentence in

21     the lower 25 percentile.

22          I will make this comment, Mr. Jaimes.  Mr. Jaimes and Ms.

23     Godinez were partners in crime.  They were partners in a

24     conspiracy, and they were partners in the fruits of that crime,

25     and I see no reason why they should not be sentenced equally.

1    It is further ordered that the defendant shall pay a fine

2  in the amount of $25,000.  That is due immediately.  This fine,

3  of course, represents another downward departure and is based

4  upon the defendant's ability to pay.  Payment of the fine shall

5  begin while the defendant is incarcerated.  Upon release, any

6  unpaid balance shall be paid at a rate of at least $150 per

7  month, with the first payment due 30 days after release from

8  imprisonment.  The Court finds that the defendant does not have

9  the ability to pay interest on this fine.  Therefore, the

10  interest is waived.  In the event the fine is not paid in full

11  prior to termination of supervised release, the defendant is

12  ordered to enter into a written agreement with the financial

13  litigation unit of the United States Attorney's office for

14  payment of the remaining balance.

15    Additionally, the value of any future discovered assets

16  may be applied to offset the balance of the criminal monetary

17  penalties.  The defendant may be included in the Treasury

18  Offset Program allowing qualified federal benefits to be

19  applied to offset the balance of the criminal monetary

20  penalties.

21    Upon release from imprisonment, the defendant shall be

22  placed on supervised release for a term of five years as to

23  Count 1 of the indictment.  Within 72 hours of release from

24  custody of the Bureau of Prisons, the defendant shall report in

25  person to the probation office in the district to which he is

released. While on supervised release, the defendant shall comply with the mandatory and the standard conditions that have been adopted by the Court and shall not possess a firearm.

In addition, the following special conditions are imposed: Number one, the defendant shall not -- or shall provide the probation office with access to any requested financial information.

Number two, the defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation office and unless the defendant is in compliance with the installment payment schedule.

Number three, the defendant shall participate in a program of testing and/or treatment for drug or alcohol abuse as directed by the probation office. If enrolled in a drug or alcohol treatment program, the defendant shall abstain from consuming alcoholic beverages during treatment and shall continue to abstain for the remaining period of supervision. The defendant shall contribute to the cost of treatment in accordance with the probation office co-payment policy.

Number four, the defendant shall not possess, ingest or otherwise use a synthetic cannabinoid or a synthetic narcotic unless it is prescribed by a licensed medical practitioner and for a legitimate medical purpose.

Number five, in the event the defendant resides in or visits a jurisdiction where marijuana or marijuana products

1    have been approved, legalized or decriminalized, the defendant

2    shall not possess, ingest or otherwise use marijuana or

3    marijuana products unless prescribed by a licensed medical

4    practitioner and for a legitimate medical purpose.

5       And number six, the defendant shall submit his person,

6    property, house, residence, vehicle, papers, electronic

7    communication devices or office to a search conducted by a

8    United States Probation Officer.  Failure to submit to search

9    may be grounds for revocation of supervised release.  The

10    defendant shall warn any other occupants that the premises may

11    be subject to searches pursuant to this condition.  An officer

12    may conduct a search only when reasonable suspicion exists that

13    the defendant has violated a condition of supervision and that

14    the areas to be searched contain evidence of this violation.

15    Any search must be conducted at a reasonable time and in a

16    reasonable manner.

17       If the Court has erred in the findings affecting any of

18    the applications of the advisory Federal Sentencing Guidelines

19    in this case, I note for the record that the Court would have

20    imposed an identical sentence pursuant to any available

21    variance or a non-guideline sentence which would be based upon

22    the defendant's conduct in the case, the statutory sentencing

23    factors found under Section 3553 of Title 18, and any and all

24    aggravating and mitigating circumstances attendant in the case.

25       Pursuant to Section 862 of Title 21 of the United States

1  Code, the defendant is ineligible and is deemed ineligible for

2  any and all federal benefits for a term of one year.  It is

3  further ordered that he shall pay the mandatory special

4  assessment in the amount of $100.

5        I will recommend that he be housed in a facility closest

6  to home for purposes of visitation and that he be allowed to

7  participate in any drug treatment program for which he is

8  deemed eligible by the Bureau of Prisons.  Anything else on

9  behalf of the government?

10             **MS. COLE:**  No, Your Honor.

11             **THE COURT:**  Anything else on behalf of the defendant?

12             **MS. ALLRED:**  No, sir.

13             **THE COURT:**  Very well.  The defendant is remanded to

14  the custody of the United States Marshals pending designation

15  to the appropriate institution.

16        Ms. Caldwell, I have not noted your good work, but thank

17  you so much for helping the Court as an interpreter.  If

18  nothing else, thank you all.

19                        (HEARING CONCLUDED)

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF COURT REPORTER

4

5          I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6     Reporter for the United States District Court for the Southern

7     District of Mississippi, appointed pursuant to the provisions

8     of Title 28, United States Code, Section 753, do hereby certify

9     that the foregoing is a correct transcript of the proceedings

10    reported by me using the stenotype reporting method in

11    conjunction with computer-aided transcription, and that same is

12    a true and correct transcript to the best of my ability and

13    understanding.

14         I further certify that the transcript fees and format

15    comply with those prescribed by the Court and the Judicial

16    Conference of the United States.

17

18

19

20         S/ Teri B. Norton
           TERI B. NORTON, RMR, FCRR, RDR
21         OFFICIAL COURT REPORTER

22

23

24

25